Good afternoon, Illinois public court first district court is now in session, the sixth division, the Honorable Justice Carly Walker presiding case number 21 dash 1579 estate of Canada a slinger versus David Collins MD. Good afternoon, everyone. I'm just as Walker and I have here with me today, just as Odin Johnson and just as Taylor. And what I'd like to do first is ask the lawyers if you could please introduce yourselves. Good morning. Good afternoon, Your Honor, justices. My name is Patrick we met, I represent the plaintiff appellant, the estate of Janet slander. Mr we met you've got a different name appearing there is that your middle name. I think that's how you pronounce it. That's correct. Oh, that's how it's pronounced. Oh, we met. Okay. All right, gotcha. Okay. All right. And Castle. Good afternoon. My name is Margaret Fitzsimmons, and I'm here on behalf of defendant appellees. Dr. David Collins and EM strategies Ltd. Excellent. Thank you. And Mr we met, how much time do you need today, we will allow you some time for rebuttal. How much do you want to preserve each one of you have 20 minutes, and how much you want to reserve. I would like to reserve five minutes for rebuttal. You have it. All right, so with that Mr we met you can go ahead and get started. Again, good afternoon, Justice Walker Taylor and Johnson. My name again is Patrick we met I represent the plaintiff appellant in this appeal. May it please the court. This is an appeal of the trial courts order graining summary judgment to the defendants. Dr. David and EM strategies, limited EM strategies limited is Dr. The trial court rule that no physician patient relationship existed between the decedent Janet slinger and Dr. Collins, when she presented herself into the emergency room at silver cross hospital on December 11 2016. We believe the plaintiff repellent position in this case is that the trial courts ruling as a matter of law, granting summary judgment was an error. The reason is, is that a physician patient relationship did exist, both a special physician patient relationship, and the consensual physician patient relationship existed on the date that Janet slang or entered into the emergency room. The reasons for this particular position that we had is that Dr. Collins, who was the emergency room attending and supervising physician for Janet reviewed Janet's medical chart, which included her, the patients, presenting illness or diagnosis. Her physical examination laboratory test and test results. And evaluated the patient chart to determine. And for the purpose to should be discharged from further medical care and treatment. If your honors would, I would present all the. In. Now, Mr. We met. You're frozen Mr. We met I don't know if you can hear us, but we cannot hear you. Hey. Am I the only 1 who can't hear him? No, okay. You're frozen. So, let's let's try this. We normally don't do this, but we're going to try this and see if it works. Turn your video off. Turn the video off. Stop the video correct. Yes. Okay, now go ahead and finish you may want to go back a little bit, because we missed a lot of what you said. You'd have to begin. Can you just hear me. Barely. But let's try it. Go ahead. Continue with your argument. As I was presenting the argument is our position that a physician patient relationship existed between Janet slinger and. Dr. David Collins, when she presented herself in the emergency room on December 11, 2016 at silver cross hospital. Our position is, is that Dr. Collins. Took affirmative acts in the participation and the care and medical care and treatment of Miss slinger. Those acts that we point out in our brief is that Dr. Collins was responsible for the final disposition of the patient or the discharge. So, the. In approving the discharge in this case, Dr. Collins reviewed. The clinical data that was prepared by nurse practitioner. Harry Kennedy, the review the data. He evaluated that clinical data, and then based on his review and evaluation of the clinical data. He approved and authorized the discharge. Right there for a 2nd, Mr. We met because the argument is that he never reviewed or evaluated anything that he only engaged in an administrative act. He also, they also alleged in their briefs that he was not an attending physician, but instead just the position working in the emergency room. So do you want to respond to that? Yes, and if I may take the last point in the beginning. The, as far as the attending physician, there were questions in the deposition were asked of Dr. Collins. By silver cross hospitals council and the question was asked whether or not when. In the context of the Janice layer was given an emergency severity index number of number 3. Dr. Collins was he asked whether or not in his capacity. In physician on that date with the 3. Did he agree with that? He did not object. I would not be attending position. In fact, he answered the question that he agreed with that. And if I may. Point to the question. It's on the record. It's on pages 726. 728 to 29. The following questions were asked of Dr. Collins is the attending question. So the categorization and triage of this patient Janet as an 3. now, that's the emergency severity index number of number 3. She was given on December 11th while in the emergency room. From your perspective as an attending emergency room physician was appropriate question. Answer by Dr. Collins. Yes. Next question. At the time he wrote the addendum note. Now, this is referring to the note that he wrote. I was a supervising position and approved the discharge plan. Dr. Collins was asked. You would have reviewed the sections of the chart that you've identified for us. You would have reviewed the sections of the charts you have identified for us. Correct. Correct. In reviewing those sections of the note, particularly documentation by mid level provider Kennedy. And the labs and the other information contained there in you as an attending emergency room physician, you do not believe. That the standard of care required of APN Kennedy. Requested your collaboration. True. True. So, Dr. Collins admits in the context of the emergency room with Janet Slanger, he was an attending physician and also the supervising physician. Now, with respect to the 2nd question, Justice Walker that you post. That they claim that he had no involvement whatsoever. That is, in fact, the point of the cases that we've put in our briefs in each case. Versus St. Francis hospital. The Matthew versus. Midland versus the United States, Louis versus health care systems and each of those cases, the facts are the physician did not see or speak examine or actually treat the patient. But each of those cases, the physician had active participation in the medical care. In this sense that there are in each of the cases where the court has found. That there was a physician patient relationship in this case, a special physician patient relationship. In each of those cases, the court found 3 determinative facts. 1 is did the physician. Review the clinical data of the patient. 2nd, did the physician evaluate that clinical data. For the patient, and 3rd, based on the review and evaluation of the clinical information of the patient did the position. Either approve or determine himself or herself a course of action for the patient. For example. In Rovera versus St. Francis. Doctors Bliley and Edgar reviewed an angiogram. Based on their review, they evaluated whether or not the patient was a suitable candidate for angioplasty surgery. Based on the review and evaluation, they determined. And recommend that he was a suitable candidate. The same is true in the Mackey versus Roka case. In that case. The emergency room physician. Gave Dr. DeFranco the urologist in that case. Information clinical data about the patient. Dr. DeFranco evaluated that data. And concluded that the patient could be discharged from the emergency room. Finally, in Lewis versus health care. The physician in that case was Dr. Examined and treated the patient. And the clinical data from that examination and treatment and laboratory tests and findings was placed on the chart of the patient. Dr. Jager, the physician at issue in the case, simply reviewed the chart. Did nothing more. Never saw the patient. Never spoke to this patient. Never interacted with the patient. But reviewed the chart. The clinical data in the chart. Evaluated the clinical data in the chart. And based on that evaluation and review. Dr. Jager, the physician at issue in the case, simply reviewed the chart. And based on that evaluation and review. Concluded that Dr. Examination and treatment. Correct in all respects. And the patient was at discharge. So what we have here in these cases. Is there an affirmative acts involved? Yes. The review and evaluation. Are those acts taken for the purpose. Of evaluating the patient. Yes. In those cases. And two, was there a course of action. Based on the review and evaluation. That the physician took. And the answer is yes. In our case. Dr. Collins was Janet supervising physician. Dr. Collins was also the attending physician. Dr. Collins wrote in the chart that he was Janet's physician supervising physician. And their briefs. They argue that he was not. Necessarily her supervising physician. And that he also had no authority over her to change. Her decision. To release them. And that may not be exactly how it's argued, but you've read it. I'm sure. And they're saying that he didn't have all that authority over her. Justice Walker, with respect to the question. Did Dr. Collins have the authority. To change the plan, which was the discharge. Yes. Dr. Collins testified. When I asked him in his deposition. Quote, could you change the discharge plan? Dr. Collins answered. Quote, I mean, in dash. They generally come dash. I yeah. Dr. Collins could change the plan. He was the attending physician. And he was a supervising physician. And if he saw anything in that clinical chart. That he should have seen. So you're arguing that was a mistake in their brief. Yes. Yes. I would argue. We have different. Inferences and interpretations of the fact. Which is exactly why summary judgment should not have been granted. This was a question for the trier effect. And beyond that. I think this case is the argument that they make that. Dr. Collins had really no involvement whatsoever. With this patient. Is belied by the facts and the record. Okay. Thank you. Mr. Can I ask you a couple of questions? This is justice Taylor. Besides the nurse. Did anybody else, any other professionals see. The deceiving. Yes. The. The lineup in this multidisciplinary team in the emergency room. Was nurse mats did perform the triage. And then after the triage and nurse practitioner Kennedy and gas. Nurse. Yes. Worked up the patient and carried forward. At that point. So the resident. That saw the patient. There were no resident physicians. No, your honor. Any doctor see the patient. Actually see the patient. No, no physician. Let me direct your attention to the chart. The chart. The chart. What, what kind of information was in the chart? I assume vitals. And things like that, but what else was in the chart that Dr. Collins reviewed. Well, Dr. Collins testified that he reviewed the. The history of the presenting illness of the patient. And that entails. What were the symptoms and complaints. That Ms. Slinger. Had when she was admitted into the emergency room. Second doctor. In the chart and Dr. Collins reviewed. The review of systems and the review of systems is basically. The review of whether or not. There is coffee. Or mobility and things of that sort. And the laboratory test results. Three. Dr. Collins reviewed the lab. Test orders and the laboratory test results. That were taken. Ms. Slinger. By nurse practitioner Kennedy. For the. You know what those lab tests results. What kind of tests were performed. Do you recall. The comprehensive blood. Chemistry test. Okay. Okay. What about, were there any radiological studies done? There were no radiological studies. And that is. One of our points is, is that there should have been an imaging study. What else was reviewed? What else is in the chart? Dr. Collins. Dr. Collins also reviewed the diagnosis. Recommended diagnosis by nurse practitioner Kennedy. And nurse practitioner Kennedy's recommended. Discharge plan for the patient. Okay. Is there anything else that. Dr. Collins reviewed. When he. Signed the. The chart indicating that. He approves of the plan. That's my knowledge. He testified as to those five areas that he reviewed. He further testified that he did not recall reviewing. Nurse. Nursing assessments. Or nurse. ESI. Dr. Collins. All for any testimony about who was ultimately. In charge of the patient. I don't think that precise point. Was brought up as ultimate authority. The point. In the deposition that I. Did you ask. Did you ask Dr. Collins, whether. It was unusual or whether it. Was the case that a patient that. Presents to the ER. Can be discharged without having. A physician. Review. The plan to discharge. I did not. Because the fact that a physician did review the discharge plan. That's fair enough. Thank you. Thank you. And. I think at the, at the end of the analysis, what the. Louis versus OSF case is instructive here. The position that the defendant takes is, is that. Dr. Collins really had no involvement whatsoever. With the patient care or treatment of Janet Slanger. And that is exactly what Dr. Jagger argued. In OSF versus. Louis versus OSF. In that case. It was virtually the same fact pattern. All Dr. Jagger. Was to review. The clinical chart that was prepared by. Not a nurse practitioner, but a physician, a third year resident. Physician. And signed off on the chart. And that means approve. Of the, the 30 year residents, physicians. Medical care and treatment. And approved of that. And that medical care and treatment was included the discharge of the patient. And this is exactly the affirmative acts. That the courts. Have found that constant, that constitute affirmative acts. That show a special physician patient relationship. And that's what we believe. These facts here show. And that the trial court by ruling as a matter of law. That. Dr. Collins essentially had no involvement whatsoever with this patient. Belies the point in the facts and the record. And for these reasons, we would respectfully ask this court. To reverse. And remand this case. For further proceedings. Thank you. Thank you. Thank you. Mr. Simmons. Please the court. My name is Margaret Fitzsimmons and I represent defendant appellees, Dr. Collins. And EM strategies LTD. We are requesting that this court affirm the trial courts. Ruling granting summary judgment in favor. Of the defendants and against plaintiff on the basis that no. Duty was owed by Dr. Collins to the decedent, Janet Slanger. Because no physician patient relationship existed between the parties. The standard of review is DeNovo and this court can affirm the judgment of the trial court. On any ground apparent in the record, regardless of whether it was relied on by the trial court. I'm going to move on to the next item on the agenda. And that is. Rendering judgment, which is heck be hack. Two zero one nine. First one, eight, two, four. One four. Before I go into my argument, I want to address a few things that council mentioned. First and foremost, the suggestion that Dr. Collins was the attending physician. In this manner. If you look at the record, the entirety of the medical records. There is a listing of an attending physician on the records themselves. And what it says is Sarah Heron MD. It does not list. Dr. Collins. As the attending physician. What is the difference between the attending physician and supervising physician. So Dr. Collins and attending physician usually is the assigned physician who could admit. Or, or, or discharge a patient. In this case, Dr. Collins was not an attending physician. He was a collaborating physician. He utilized the term supervising. Physician in his addendum. And he explained during his testimony, that's just kind of a generalization he puts in there, but he's actually a collaborating physician. Who the mid tier practitioners. And in this case, that's MP Kennedy. Could speak to him if they want to, but they don't have to. So it's a really different role that he has because Dr. Collins was actually assigned to his own patients in the ER that day and would have been there attending physicians. And in this case, he was not the attending physician. For Janet's Langer. And to address the council's discussion of Dr. Collins. So what you're saying, just to clarify the point. Sure. You're saying there was no attended attending physician for this particular patient. Is that what you're arguing? In the, in the, when I'm arguing is. The person who was in charge of her was nurse practitioner. Kennedy. Right. Correct. So you're saying the listing attending on this was a Sarah Heron MD. Was listed as the attending, but Dr. Collins was not the attending physician for this patient. Right. But for that particular, for this patient though, I would argue that. Dr. Collins was the only person in the hospital. Who could authorize the discharge. Is that correct? That's not correct. I. As far as discharge goes. If you look at the medical record itself. Dr. Collins did not authorize the discharge. And P Kennedy is allowed to authorize her own discharge and did in the medical record at C. One nine two eight in volume two, she discharged the patient at two 43 AM. Then the patient left the ER. At two 55 AM, which is shown on C one nine two one in volume two. Dr. Collins did not review or sign off on the chart until 3. Five minutes after the patient left the ER at C one nine two nine volume two. And as Dr. Collins testified, the reason that he reviews and signs off on nurse practitioner Shanklin's charts, it's for billing purposes. It is not to approve a discharge and he did not approve the discharge or disprove. She was discharged already. Can I stop you there? You say it's. The only reason that Dr. Collins reviewed the chart was for billing purposes. Help me out because I don't understand that. What's the. No, that's fine. His requirement. As nurse practitioner Shanklin testified, he needs to review. As a consulting physician, as part of the collaborative agreements with mid tier providers, which include nurse practitioners. And as a consultant physician, he needs to review the charts and signs off on them.  he needs to review the charts and signs off on them. And as a consultant physician, his job is to be there if they request him to come see a patient and available. If they. Be available to them, but he doesn't have, they don't have to, there's no requirement for him. To go see a patient because they practice independently. And is also his other requirement is that he reviews. Let me stop the charts and signs off on them. Let me just stop you. Okay. Let's say the patient coded. Right. And. The nurse decided, well, you know, we could just discharge this patient. There's nothing more that we can. That we need to do. Are you saying that Dr. Collins could not overrule that decision? So I wanted to go back to the testimony. As far as my understanding is that it is nurse practitioner Shanklin's. She's the one who has the ultimate authority to make the decision. And she's the one who has the ultimate authority to make the determination of what happens with that patient. So she has the ultimate authority to make the determination of what happens with that patient. He as a collaborating position is testimony. Counsel had mentioned where there was the quote, could I change the plan? I mean, generally. I mean, in general, they come to me. Yeah. He didn't finish the remainder of the answer. It says they don't refuse. What like, if I'm going to have something you offer, I'm going to have to put common sense ahead of everything. So they definitely listen to me. My question. They're not obligated to. Okay. So. Kid Simmons. At some point, we just have to put common sense ahead of everything. Back to my hypothetical. The patient's coding. And the nurse says we're going to discharge this patient. Does that mean that. Dr. Collins. Can't say no to patients. Start treating the patient. As any physician in the ER, if a patient is coding, he can jump in and say, we need to do something. But you're saying that. Dr. Collins doesn't have that authority because the nurse. Is the ultimate care provider and she is the person in charge. And that's where I'm struggling with. You're asking the court to. To create a terrifying precedent. And I'm not requesting that. I think we're getting a little. To the left of what the facts are in this case. And I think the facts are really important in this case. And I think it's because of what actually happened in, if the physician patient relationship developed in this specific case. That hypothetical your honor. Or justice. I. You know, to, to speak to that, I would be speculating, But looking at the facts of this. Right. Because you would understand that this position has to step in. In your hypothetical, if somebody was coding. And nobody was doing something about it. Absolutely. A physician would step in and do something about it. I agree with you a hundred percent. I agree. I agree. That wasn't. But go ahead, please continue. I'm happy. I'm happy to talk about it further. But again, back to the point about it's only for billing purposes. I'm still struggling with that because you're saying that the only reason. Dr. Collins. Viewed the chart. Is so that somebody can get paid. Right. That's. I guess my question is, is. If the nurse is the ultimate person in charge. Why does the doctor need to review the chart? Because your position is that. The nurse. Is. The top person in charge of this patient. No one else can overrule. Dr. Collins testified that if she had an issue, she could speak to him and he believes that they would listen to him. If he had input. That's at his testimony where he said. They're not obligated, but most would. And that's at C one seven one seven. So. I don't know. Find that testimony would be incredible. Let me simplify it. You're referring to nurse practitioner Kennedy as a mid-level provider. Is that the term? That's correct. What would Dr. Collins be considered? You know, justice, I don't know the term for him. He's a physician. So they. He wouldn't be a mid-level. Correct. No, he would not. He would not as a physician. He has, he has a higher license. As far as mid versus upper that's correct. And let me just, another question is. Is it the usual. Protocol for the doctor to sign, to review the chart and sign it after the patient has been discharged. I believe it's after the, the charting is completed. That they sign it. In this instance, it was after discharge that he signed. So, and I believe that that, according to the testimony. It is consistent with a normal practice as well. Thank you. Is there any testimony or any evidence in the record? About whether the nurse consulted with Dr. Collins. About her decision to discharge prior to the actual discharge. There is testimony on that issue. Nurse practitioner Shanklin did not consult with Dr. Collins. And she had testified that she did not believe it was necessary to consult with him prior to discharge. Based on the presentation of the patient. She testified she was using her independent judgment while caring for the patient. She never spoke with any physician regarding her care of the patient and never considered speaking to any physician regarding her care of the patient. She saw her patients independently under her own license and testified she was not obligated to consult with them. Unless she felt she needed to. And in this instance, based on the presentation of Janet Slinger, she did not think it was necessary. And then one more follow-up on the billing part of it. Aside from the testimony that the reason. Dr. Collins. Reviewed and signed. Off on the chart. Was for billing purposes. Was there any. Further explanation. Of what he meant when he said it was for billing purposes. There was not further questioning on what he meant. It was not extrapolated. No. But it was for more than billing. Wasn't it? He stated I was the supervising physician for this patient and. Agree with the plan. So the statement that he agrees with the plan. Suggests that it's more than just billing. He did. He did testify that he did agree with the plan and agreed with nurse practitioner. Terry Kennedy's. Determinations with the patient. That is correct. Justice. And then that way it's very similar to the case. And in that case, the court determined there was no physician patient relationship. And in that case, there was an on-call attending physician. Who've reviewed the patient's test results and interpreted her EKG and wrote a report about it. And they also build for their services. And that is very similar to this case where he did review the chart. He did agree with the plan, but it was not utilized or necessary to be utilized in order for nurse practitioner. Kennedy to provide her. Her care and treatment to the patient. I also wanted to discuss the case that. Counsel for. Slanger mentioned the new case Lewis versus OSF healthcare. That case is a little bit different than this case. That case. Involved a supervising attending physician of a third-year medical students and the medical student and the physician both testified that the medical student was required to. Confer with the attending physician after they review, after they saw the patient and while they were writing the note. And in this situation, third-year medical student saw the patient. Spoke to the attending, completed the note, and then the physician signed off on it. It's different than this situation where nurse practitioner Kennedy, who had 15 years of experience, who was practicing independently. Was allowed to. Work up her patients herself independently and discharge them independently, unless she felt the need to speak with a consulting physician. There's a different requirement there than in Lewis versus OSF. Going back to our argument and essentially in order to create a physician patient relationship, there's some essential items that need to happen. It can occur when you don't meet a patient, a physician does not have to meet a patient, but they have to take affirmative action to participate in the care evaluation. Diagnosis or treatment of that patient. And in this case, this in the central inquiry is whether the physician was asked to provide a specific service for the benefit of that patient, including conducting laboratory tests, directing the treating physicians in their care, or otherwise knowingly accepting the patient as their, as their own patients. In this case, Dr. Collins did not see the patient and did not take an affirmative step to participate in the care evaluation or treatment. And nurse practitioner Shanklin did not request him to do so. In this case, when Janet Slinger went to the ER on December 11th, 2016 and saw nurse practitioner, the nurse practitioner, Dr. Collins was there and available to be spoken to, but nurse practitioner never did speak with him. So no, he never met the patient. He never directly supervised nurse practitioner Kennedy. He was not listed as the attending physician. He did not treat her, exam her order, any tests, make any diagnoses, direct any of the treatment, make any direction or provide any medical care or treatment. He didn't consult either. In any way. And he did not discuss the care and treatment with the nurse practitioner who was treating the patient and any medical opinions that he formed by reviewing the chart after the treatment was done, did not impact her care in any way. It was still in the ballpark of nurse practitioner Shanklin as her provider. Again, what did Dr. Collins do? He merely reviewed the chart at the end of her seeing after the patient had been seen and treated and the decision to discharge had been made. Can I stop you one moment? You made a point that I did not pick up on it in the briefs. And the point that you made was that Dr. Collins did not even review the chart until after the patient was discharged. Is that correct? That is correct. Your honor. And further that they were that Dr. Collins had no conversations with the nurse or anybody else at the hospital about this patient before she was discharged. Is that the evidence? These are the two things I want to clarify. One, there is some evidence that he had a conversation with the nurse practitioner about the patient, but all it was, the conversation was, Oh, she's still in the ER. There was no conversation about care or treatment of the patient or anything about the specifics of the patient, but there might've been a conversation just to that. I want to make sure that that's clear because that is in the record. Collins was aware that the patient was in the ER before. Okay. That's correct. He did see her. So a fact finder. Draw an inference that Dr. Collins was aware of the patient's condition. Based nearly on the fact that he was aware she was in the ER. I don't think so because without an examination and talking with the patient, just somebody sitting in a room, I don't think it'd be fair to say that a physician would be aware of the condition.   But there's no evidence that there was a conversation about the presentation of a patient. With the way she was presenting. The other physicians name on the chart. I'm sorry. Just to be. Physicians. Who was named in the chart. Who was that? Doctor. So she's not involved in a lawsuit, but her. Her name, the name listed was Sarah Herrin, H E R. We know is there anything evidence in the record about. Whether Dr. Herrin was even in the ER. There is no, to my knowledge, there's no evidence one way or another. On that fact. Thank you. And to speak to your question. I'll let you answer this question. And then I have a follow-up question. Sure. To speak to your question. Yes. There is in the record and it's not clearly stated in our briefs. But the timing and the medical records and the testimony of. Dr.  At 2 53 AM. The nurse practitioner shows that the patient was discharged. She discharged the patient at 2 43 AM. And according to the records, left the ER at 2 55 AM. And Dr. Collins review and signature of the addendum was at 3 AM. Okay. So somewhat of a hypothetical. Dr. Collins reviews the chart after the patient has been discharged. See something irregular. Does he have a duty then? To take some action. I would think as far as any physician goes, if they see a chart and there's something that's irregular, then I would think the answer would be yes. I don't think though, in the context of this about whether or not a physician patient relationship existed, the mere possibility that there could be a connection or an affirmative action that needed to be taken. Doesn't create the duty. It's whether or not an affirmative action was knowingly taken by the physician. So it's a little bit different. So your hypothetical, yes, I think there would be, but in this instance, there wasn't. So it's the affirmative act on behalf of the physician. Okay. So I would think that the physician is a, is an integral part in this. But he's reviewing the chart because it's his duty as the supervising or collaborative physician. It's not worse. Some random physician has just picked up the chart and looked at it and saw it. And that's true. And in cases like that, though, that's similar to. The case that I just discussed, Gillespie where a physician who was the attending looked at it after discharge made a note regarding an entire report regarding what he reviewed. And he still had not created a physician patient relationship there because it was post-discharge. Now, Ms. Fitzsimmons, I've been trying to jump in for about four minutes now, but, and you're out of time, but I did have one last question. And you may have misspoke. You said earlier that he did see her, but then prior to that statement, you said that he only had conversations with the nurse regarding her. And I didn't know if you meant by seeing her, if you meant just saw her in the emergency room, or did you mean that usually when you say a doctor saw someone, it means something different. So can you clarify what you meant by that? Yes. Justice Walker. Thank you for the question. Yes, I will clarify. He did not see the patient in the realm of a doctor seeing a patient. She was located in the ER and there was a conversation that, Oh, that patient's in the ER. That's it. Not, not any interaction or any true seeing of the patient, if that clarifies it for you. It does. And now can you go ahead and just sum up? Because you're actually out of time. Okay. As on behalf of the defendant appellees, we're requesting that the court affirm or this court affirm the trial court's determination that summary judgment should be granted on their behalf because no physician patient relationship existed between Janet Slanger and Dr. Collins on the basis that he did not take any affirmative action in the care and treatment and was not requested to take any affirmative action in her care and treatment. In addition, he did not discharge the patient and the nurse practitioner did and any medical opinions that he may have formed would not have impacted the care and treatment of the patient. Mr. Simmons, one more question. Sure. Back to this, you know, it was for reimbursement. Could one fairly infer that the reason why Dr. Collins signed off on the chart was so that he could be reimbursed at a higher rate for doctor than say nurse practitioner? I don't think so. I think it's for her own charting. I, and I, and honestly justice, this would be pure speculation on my part. I don't know. And it wasn't quite, their questions weren't followed up. So I don't want to speculate on that. And so just, I was going to avoid that question, but since justice Taylor went into it, so is it that the whole purpose of Dr. Collins signing off on all of these patients coming through the ER, many of which, according to your statements, he, he does not even see because they're only seen by the nurse practitioner. And that's so that he is, he's also able to bill. Is that correct? So your honor, that would be speculative. I don't think that that's the point. The only question that has to do with the charting, and I'll just read it to you guys so that we all are on the same page is he says, quote, is there a policy or a rule where the supervising position must sign off on a patient's care when they're at silver cross hospital question answer in order for billing, we have to sign off on the chart. And that's the information that we have on that issue. Right. And so they, they bill for Dr. Collins's time as well. Correct. Or him having had contact with the patient. Correct. I don't believe since he did not have contact with the patient, I don't believe that they bill for having contact with the patient, but again, I'd be speculating on the billing practices. That wasn't something that was, you know, part and parcel to the questioning of the physicians in this case. Were there any other further questions for Ms. Fitzsimmons before we move on? No, thank you. Thank you. This is your dad. Okay. Mr. We met. Thank you. Uh, your honors, can you hear me? Cause I have now, uh, I'm on the screen. We can hear you. Thank you. I have a few points that I'd like to make and go straight into it. Uh, the argument now the defendants are making, uh, they made the first argument that Dr. Collins had no involvement whatsoever with this patient. That is simply the record does not support that stance. Now suddenly a new argument that Dr. Collins, uh, that Janet Slinger, I'm sorry, was discharged. And that's when Dr. Collins at 3.00 AM, uh, did his evaluation, his review and so on and so forth. The record does not support that. The fact of the matter is, is that nurse practitioner Kennedy testified that at two 43 to 45 AM on page 1934 of the medical record, uh, in this case that she signed off the chart to Dr. Collins. The purpose of signing off that chart to Dr. Collins was for the final disposition of the patient. I asked Dr. Collins specifically, could a patient at silver cross hospital emergency room be discharged without the super supervising physician signing off the chart? He answered in his deposition. No, that was the purpose of the billing justice Taylor and justice Walker. The billing was to bill for his services and the law in Illinois on a special physician patient relationship is did the physician take affirmative acts in participation in the treatment care diagnosis or evaluation of the patient and the facts in this record show that Dr. Collins testified that he took affirmative acts. Those acts consisted of, I reviewed the clinical data, the medical chart of this patient. Second, I evaluated the medical data contained in that chart. Third, I approved of this patient's discharge from the emergency room and did not feel any further medical care or treatment was necessary. That is the testimony by Dr. Collins. He billed for that and he testified that no patient could be discharged from that emergency room without him signing off the chart. And that's exactly it. Is there evidence in a record that Dr. Collins built for his services? Yes, there is. Uh, the, one of the exhibits in, uh, attached to the motion in, uh, uh, in opposition to the summary judgment, uh, was the EM strategies billing record and the billing. And I referenced this in the reply brief, I believe, uh, in our case and the billing statement has two components. One is called MD services and they abbreviate service SRVC and the other is emergency room visit. So there's two separate line items, medical doctor services and the emergency room visit. That bill was sent from, uh, EM strategies, Dr. Collins and NP Kennedy's employer to Janet Slanger after her death. So there is in the record, uh, reference that the billing for Dr. Collins's services did exist. Uh, and second, the case was, I referred to the, the, all the cases that we rely on is support the Bovera versus, uh, St. Francis, the Midland versus us, uh, the, uh, Lewis versus OSF, uh, and Mackie versus Soroka. Each of those cases the Illinois courts have taught us is, is that the affirmative acts that a physician, uh, that are sufficient to constitute a, uh, special relationship is a review of clinical data and evaluation of clinical data and a course of action for the patient. And in this case, Dr. Collins reviewed the clinical data. He evaluated the clinical data. He concluded that the reason that the care and treatment was reasonably appropriate and he approved the discharge and no patient could be discharged from that hospital without him signing off on that chart. Well, how do you respond to the fact that, that, that he, she was already discharged. She was gone already. Uh, you, you're just saying that's just not true. Or are you saying that something else? Justice Walker, I, my position is is that the record does not reflect that Janet Slanger was physically out of that hospital prior to Dr. Collins signing off and approving her discharge. Otherwise, it would have been a complete violation of silver cross hospitally policy and rules. And I just don't believe that happened. And I don't, the record doesn't reflect that that happened. And I, I'm sorry. No, I'm sorry. Go ahead and finish. I thought you were done. I'm sorry to interrupt you. The, the, the record reflects it at two 43 is two 45 years. Practitioner Kennedy recommended the discharge. That was her assessment, nursing assessment. She then testified that she signed off the chart to Dr. Collins, Dr. Collins under silver cross hospital policy and rules, uh, was to arrange for the discharge of the patient. And then he testified that he did arrange and approve that discharge, but there's no evidence that Janet physically was out of that hospital, similar to a Gillespie case, uh, similar to the Gillespie case versus the, uh, uh, that has been cited by defense council. But our position in, in, in, in a thumb up, uh, your justices is simply this, the actions, the affirmative acts taken by Dr. Collins, the night of December 11th, 2016 in the emergency room, which consisted of evaluating, reviewing, and approving the discharge are affirmative acts taken in the patient's care and treatment absent Dr. Collins approval of the, uh, discharge after his review of the medical care and treatment given. Uh, uh, Miss Langer, uh, would not have been discharged from the hospital and he could have changed the plan. And he testified that he had the authority to change the plan when he said, yeah, they tried to backtrack, but he said, ultimately, if I have something to say, they're going to listen because he is. So Mr. Yeah, we we've kind of gone through that already. I want to kind of cover something a little bit different here really quickly because you're out of time now as well, but the, and if the justice questions will go on, but the, you filed a motion to cite additional authority. Ms. Fitzsimmons has distinguished the Lewis case on the basis that that case involved a third year medical student who was being supervised by the attendant physician, attending physician, and that the attending physician was actually involved with telling the medical student everything to write and medical student went back and wrote what the student was told to write. And that that involvement was a little bit different than here. And I want to have you respond to that, how Ms. Fitzsimmons has chose to reconcile that case. I believe that the, that the Lewis case is actually literally almost on all fours because of the facts in Lewis is, is that Dr. Tao, who was the third year resident physician in that case, uh, was not involved in preparing the, the patient chart. Dr. Jaeger had no involvement whatsoever in preparing the chart. And Dr. Tao didn't even have an oral consult with Dr. Jaeger. So Dr. Jaeger did exactly what Dr. Collins did in this case. He simply reviewed the clinical information contained in the chart. In that case. And approved. The third year resident physicians handling. Was it a third year resident or third year medical student? I maybe I misunderstood something. It's a third year residents today. Cause that's different, but go ahead. Yeah. I think our, our, our case is even stronger because Dr. Collins. Is supervising a nurse. Doctor. Not. The college has supervised a nurse practitioner. Yeah. And Lewis it's they're supervising doctors. Correct.   Yeah. Yeah. Correct. And this is a third year resident. It was already a physician. And. And I believe in internal medicine. In that case. But our case is even stronger. Dr. Collins is supervising a nurse practitioner. And Dr. Collins agreed. And it's in the record with silver cross hospital. That he would supervise. The medical care and treatment provided. By nurse practitioner Kennedy while she was in the emergency room. So I believe our case is even stronger. But the, the, in fact. When we look at the Lewis case. Dr. Collins and Dr. Jagger are in the same position. They simply reviewed. The clinical data that was prepared by. A medical physician. And in this case, a nurse practitioner. They evaluated that data. And they approved the decision-making. Of the, the medical. The medical resident. And in this case, the nurse practitioner. These are affirmative acts. That under Illinois law. That our courts have found. Create and establish a special physician relationship. Therefore, Mr. Mr. Simmons. Argued that. The evidence in the record shows that. Dr. Collins. Reviewed the chart after. The patient was discharged. And in support. Points to the timestamps on the. In the chart. And I think the. Review. Of the record by Dr. Collins was a few minutes. After. The patient was discharged. And so what's your response to that? Yeah. Just to say my response is that the record does not reflect that. What the record reflects is that nurse practitioner Kennedy. At two. 43 to 45. A quote, and I'm quoting from. The record at 1934. Of the record in the emergency. Chart. What I'm saying here. Is, is that. She writes the plan. The plan is. That the disposition medically cleared for discharge. Time. Two 43. To home. Now that does not indicate. That Ms. Slanger has left the emergency room. There is no evidence that exactly. When Ms. Slanger. Left the emergency room. I thought Ms. Fitzsimmons. Did say. Some timestamp, like 302. Something like that. And it was a few minutes before Dr. Collins. I could be wrong, but I thought that's what she said. Five minutes. Yes. She did say five minutes to 55 and he signed it. She left the two 55. He signed it three. That's what counsel suggested. That at two 55. Janet Slanger has physically left the hospital, but that's not in the record. What's in the record is, is that there's a recommendation for a discharge at two 43 to 45. By nurse practitioner Kennedy. And then Kennedy. Importantly says I signed off the chart. To Dr. Collins. Then the purpose of signing off the chart to Dr. Collins. Is for his review and evaluation and disposition.   Is for his evaluation and disposition. Because Dr. Collins testified. No patient could leave that emergency room without supervising physician. Approving the discharge. So either they violated the civil cross hospital policy. Or. When you facts or that Dr. Collins approved that discharge through his evaluation and review. And it occurred prior to Janet physically. Leaving that hospital. So in conclusion, your honors. The plaintiff appellant is not asking this court. To create new. Or extend existing law to facts. That have never been addressed. What the plaintiff appellant is asking the court is to apply the existing law to the facts of this case. Which show that a, a special physician patient relationship did exist. And that the trial court. The ruling as, as a matter of law, that such a relationship did not exist was an error. And we respectfully request this court. Remand this case. Reverse the trial court and remand the case. For further proceedings in the trial court below. And I thank you for the opportunity to present. Our view of the case to this court. Thank you. Thank you. Were there more questions? Justices. No, thank you. So thank you both. We appreciate excellence. You both did a very good job with your briefs. And your arguments today have been phenomenal. So we do appreciate both of you and we appreciate your excellence. Have a good day.